# EXHIBIT 4

**Steven Fass, M.D.**
**Capital Surgeons Group**
**3705 Medical Parkway, Suite 250**
**Austin, TX 78705**

Robert Hammer
675 N. Henderson, Suite 300
Fort Worth, Texas 76107

Dear Mr. Hammer:

I have reviewed Beth MacNeill's medical records and the depositions and have formed opinions about her care and treatment.

I am qualified on the basis of my education, training and experience to offer opinions on the issue of whether Nirmal Jayaseelan, M.D. departed from the accepted standards of medical care under same or similar circumstances regarding Beth MacNeill. I am also qualified on the basis of my education, training and experience to offer opinions on whether or not Harris Methodist Fort Worth provided appropriate emergency medical screening examination and stabilization to Beth MacNeill. I am licensed to practice medicine and surgery in the State of Texas and I was practicing medicine and surgery at the time the incident made the basis for this claim. I am educated and trained in general and laparoscopic surgery. I graduated from the University of Texas Southwestern Medical School in 1994. I completed a residency in general surgery at the University of Utah in 1999 and a fellowship in Advanced Laparoscopic Surgery at Cedars-Sinai Medical Center in 2000. While at Cedars-Sinai, I participated in the clinical trials that eventually led to the FDA approval of laparoscopic adjustable gastric bands for use in the United States.

I began practicing general surgery in 2000 and bariatric surgery in 2002. I was practicing general and bariatric surgery in 2012 and at the time of this report. I am a practicing general and bariatric surgeon with Capital Surgeons Group, PLLC and Southwest Bariatric Surgeons, PLLC in Austin, Texas. I have medical and surgical privileges at Heart Hospital of Austin, St. David's South Austin Medical Center, St. David's Medical Center and Seton Medical Center. I am a member of the American Society for Metabolic and Bariatric Surgery and the Society of American Gastrointestinal Endoscopic Surgeons. I have performed surgery for the treatment of reflux disease. I have performed lap band surgery and gastric surgeries for the treatment of chronic obesity and I routinely receive surgical consultation requests from hospital emergency departments.

My opinions are based on my review of the following:

1) Medical records from Nirmal Jayaseelan, M.D.;
2) Medical records from Texas Health Harris Methodist Hospital Fort Worth;
3) Medical records from Baylor All Saints Medical Center at Fort Worth;

4) Medical records from Forest Park Medical Center;
5) Medical records from Baylor University Medical Center at Dallas; and
6) Medical records from Blair Connor, M.D.;
7) Deposition of Nirmal Jayaseelan M.D.
8) Deposition of Beth Chaney MacNeill
9) Deposition of Domingo Tan M.D.
10) Deposition of Chad Carlton M.D.
11) Deposition of Neil Talbot M.D.

A review of the medical records does not describe what actually happened to this patient. The medical records are vague, nondescript and contradictory. From my review of these medical records, I could not determine the basis for the preoperative diagnosis nor could I determine what surgical procedure was actually performed.

According to the medical records, Beth MacNeill was a 46-year-old female with a history of having undergone laparoscopic gastric band placement by Nirmal Jayaseelan, M.D. in 2005. She had a lap-band un-fill in June 2011 but returned in April 2012 for a possible fill because she was gaining weight.

On April 21, 2012, Ms. MacNeill underwent an endoscopy by Dr. Jayaseelan for a diagnosis of gastroesophageal reflux disease (GERD). Dr. Jayaseelan reported that the patient had symptoms consistent with GERD, although there was no documentation of this in the records. Dr. Jayaseelan's EGD on Ms. MacNeill clearly stated that the endoscopy was normal. She did not have esophagitis. Furthermore, Dr. Jayaseelan's office notes of April 25, 2014 state that Ms. MacNeill denied reflux. She did not have a subjective or objective diagnosis of GERD.

Yet, according to the medical records, on April 27, 2012, Dr. Jayaseelan performed an outpatient gastric fundoplication for GERD on Ms. MacNeill. The consent form identifies the surgical procedure as a laparoscopic Nissen fundoplication. The consent form does not identify stomach perforation as a risk of the procedure. Dr. Jayaseelan's operative report states the procedure performed as a laparoscopic fundoplication for worsening gastroesophageal reflux disease (GERD). Dr. Jayaseelan does not describe the surgical procedure in his operative note nor does he mention removal of the lap-band, a prolapse or lap-band slippage. He simply states that a fundoplication was performed.

On April 28, 2012, Ms. MacNeill developed severe abdominal pain and went to Texas Health Harris Methodist Hospital Fort Worth. She was evaluated by Neal Bevan Talbot, M.D. She was tachycardic with tenderness in the right lower quadrant, epigastric area and the left lower quadrant. She had chest pain that radiated to her left shoulder. She had nausea and vomiting. Labs showed a leukocytosis and bicarbonate of 16 suggestive of acidosis. Dr. Talbot ordered a CT imaging study of the abdomen and pelvis without oral contrast. The CT image showed pneumoperitoneum and ascites. The radiologist recommended "close follow up to exclude the possibility of a leak". Texas Health Harris Methodist Hospital Fort Worth did not admit her, request a surgical consultation, or obtain a follow up CT image with GI contrast. Dr. Talbot discharged her home.

Approximately 12 hours later, Ms. MacNeill presented to Baylor All Saints Medical Center at Fort Worth via ambulance in septic shock. Her abdomen was distended and diffusely tender to palpation. She was hypotensive, tachycardic and had a lactate of 9.37. She was in acute

renal failure with a creatinine of 2.5. CT images with oral contrast showed gross pneumoperitoneum and massive ascites indicative of a perforation. Baylor All Saints Medical Center at Fort Worth admitted her to the ICU where she was intubated, received pressor support and fluids to maintain her blood pressure. Ms. MacNeill was transferred to Dr. Jayaseelan at Forest Park Medical Center for surgery the next day. Dr. Jayaseelan performed an emergency exploratory laparotomy and a 1cm gastric perforation was discovered. He did not identify the location of the perforation in his operative note. Ms. MacNeill required 2 further surgeries to drain her abdomen.

There were standards of care that applied to general and bariatric surgeons under the same or similar circumstances confronting Nirmal Jayaseelan, M.D. I am familiar with the standard of care for general surgeons and bariatric surgeons regarding the care and treatment of patients like Beth MacNeill.

Based on my review of the medical records but, more specifically, Dr. Jayaseelan's deposition testimony, it is my opinion that Dr. Jayaseelan's care and treatment of Ms. MacNeill deviated from the standard of care for a general or bariatric surgeon in April 2012.

It was inappropriate and substandard care for Dr. Jayaseelan to diagnose and treat Ms. MacNeill for GERD. His EGD findings and his 4/25/2012 office notes clearly show that the patient did not have GERD. Yet, his operative notes state that he performed a fundoplication for GERD.

At surgery, Dr. Jayaseelan performed a gastric imbrication. I presume it was below the level of the band since he did not mention in the op note that he removed the band. This procedure was likely performed for a failure to lose weight. However, in his office notes on 4/25/2012, Dr. Jayaseelan states "Different surgical procedures including gastric bypass with Roux-en-Y anastomosis, Lap Band, Vertical banded Gastroplasty, Biliopancreatic diversion and Biliopancreatic diversion with duodenal switch were discussed in great detail..." His note does not mention to the patient the gastric imbrication procedure or any of its risks. Also, the consent form identifies the surgical procedure performed as a laparoscopic Nissen fundoplication. At his deposition on 10/17/2014, Dr. Jayaseelan admitted that he did not perform a laparoscopic Nissen fundoplication. He testified that he actually performed a gastric imbrication which is a completely different procedure. Regardless, neither the consent form nor his office notes indicate that he ever discussed the planned procedure or any of its risks including a stomach perforation, the very complication Ms. MacNeill suffered. Dr. Jayaseelan should, at minimum, inform the patient the procedure he was going to perform and discuss the risks associated with that procedure.

In his operative report Dr. Jayaseelan failed to describe the surgical procedure performed. He does not describe the gastric imbrication or the technique he used. He testified that Ms. MacNeill's lap band had prolapsed. The operative note simply does not describe a prolapse. If it did the band would need to be removed or the prolapse corrected. While he dictated that he performed a fundoplication he admitted at his deposition that he actually performed a gastric imbrication procedure where he plicated the stomach below the lap-band. The operative report does not describe this. In fact, he testified that he intentionally left it out. His failure to describe his surgical technique in his operative report is substandard. His misrepresentation of the operative procedure is fraudulent.

Dr. Jayaseelan performed a gastric imbrication. Gastric imbrication is experimental and not consistent with the standard of care for GERD or obesity. If surgery were performed for failure to lose weight the standard of care would have been to remove the band and perform a gastric bypass, sleeve gastrectomy or biliopancreatic diversion with duodenal switch. Gastric imbrication is not consistent with the standard of care. His choice of surgery and lack of appropriate consent are below the accepted standard of care for a general or bariatric surgeon.

Dr. Jayaseelan failed to provide adequate coverage for his patients on 4/28/2012 and 4/29/2012. According to the Baylor medical records, Dr. Carlton attempted to contact Dr. Jayaseelan to arrange a transfer of Ms. MacNeill. Alan Winter M.D. was providing call coverage for Dr. Jayaseelan. However, Dr. Winter refused the transfer because he was not a bariatric surgeon. Physicians have an obligation to provide coverage for their patients and the covering physician must be qualified to treat the patients they are covering. Failure to provide adequate coverage for a bariatric patient and their complications is below the standard of care.

Dr. Jayaseelan testified that Ms. MacNeill perforated because of violent vomiting. That is simply not true. Violent vomiting is common and people do not perforate their stomach because of violent vomiting. Ms. MacNeill perforated because of a complication of her imbrication surgery, not vomiting. While vomiting may have contributed to her problems, the perforation occurred as a direct complication of the surgery.

There were standards of care that applied to any physician evaluating post-gastric surgery patients with severe abdominal pain for possible gastric perforation or leak. I am familiar with the standard of care that applied to Dr. Talbot regarding his clinical evaluation and diagnosis of Beth MacNeill.

Ms. McNeill presented to Texas Health Harris Medical Center on 4/29/12 at 00:08 with abdominal pain. She was tachycardic, had a leukocytosis of 15.1 and bicarbonate of 16. Dr. Talbot ordered the CT imaging study without GI contrast. A moderate amount of ascites was noted which is "more than expected." Pneumoperitoneum and ascites are indicative of a perforation. Gastric perforation is a surgical emergency. A delay in repairing a gastric perforation will likely cause a material deterioration of the patient's condition. The radiologist could not exclude the possibility of a leak and Dr. Talbot should have ordered GI contrast to rule out and assure himself that the patient did not have a leak. Dr. Talbot should have requested surgical consultation, admitted the patient or repeated the CT scan with oral contrast.

Ms. MacNeill's last recorded HR before discharge was 146 despite fluid resuscitation and pain medication. Unexplained tachycardia along with a leukocytosis and evidence of acidosis in a postoperative patient certainly warranted evaluation by a surgeon for possible postoperative complications. Discharging her from the ER clearly was inappropriate and inconsistent with the standard of care. Dr. Talbot had objective information about the patient, at the time of discharge, that was worrisome and demanded further evaluation.

I have been asked to assume that the phrase "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual in serious jeopardy, serious impairment to bodily functions or serious dysfunction of any bodily organ. I also have been asked to assume that the term "stabilized" means that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility. It is my opinion that Beth MacNeill's gastric

perforation was an "emergency medical condition" that was not "stabilized" by Texas Health Harris Methodist Hospital Fort Worth. Gastric perforations are a surgical emergency and the absence of immediate medical attention can reasonably be expected to put the health of the patient in serious jeopardy. Beth MacNeill required the services of a surgeon and her condition likely deteriorated until she was stabilized, drained, washed out and the perforation was surgically repaired. The delay in surgically repairing her gastric perforation caused her condition to deteriorate.

These opinions are based on my review of the medical records listed above. My opinions are based on my education, training and clinical experience. My opinions are based on reasonable medical probability. I reserve the right to modify or amend my opinions in this case if presented with new or additional information.

I have not authored any publications in the previous 10 years nor have I testified as an expert witness either at trial or by deposition in the previous 4 years. My charges for review of the medical records, research of the literature and reports are $400 per hour.

Sincerely,

Steven M. Fass, M.D.

# EXHIBIT 5

# Steven M. Fass, M.D., F.A.C.S.
5809 Long Court
Austin, TX. 78730
(512)241-0969
stevenfass@hotmail.com

**Work Experience**

Capital Surgeons Group, P.L.L.C.
Southwest Bariatric Surgeons, P.L.L.C. (est. 10/2003)
Austin, Texas
08/2000-Present

**Education**

| | |
|---|---|
| Fellowship | Cedars-Sinai Medical Center<br>Program: Advanced Laparoscopic Surgery<br>1999-2000 |
| Residency | University of Utah<br>General Surgery<br>1994-1999 |
| Medical School | University of Texas Southwestern Medical School<br>1990-1994 |
| College | University of Texas<br>Austin, Texas<br>1986-1990 |
| High School | Clear Lake High School<br>Houston, Texas<br>1982-1986 |

**Licensure**

State of Texas
License Number L0168
2000-Present

**Certification**

Diplomate
American Board of Surgery
Certificate Number 44919
2000, recertified 2008

Fellow
American College of Surgeons
2003

# Steven M. Fass, M.D., F.A.C.S.
5809 Long Court
Austin, TX. 78730
(512)241-0969
stevenfass@hotmail.com

## Publications

Hui T, Fass S, Thoman D, Spyrou M, Phillips E. "Repairing Giant Hiatal Hernias with Mesh". Accepted to *The American Surgeon*.

Fass S, Hui T, Lefor A, Maestroni U, Phillips E. Safety of Laparoscopic Splenectomy in Elderly Patients with ITP. Accepted to *The American Surgeon*.

Hui T, Fass S, Giurgiu D, Ida A, Takagi S, Phillips E. Gastroesophageal Disease and Nausea: Does Fundoplication Help or Hurt? *Archives of Surgery* 2000;135:549-9.

Eichorn E, Alvarez L, Jessen M, Fass S, Chao R, Haagen D, Grayburn P. Measurement of Coronary and Peripheral Artery flow by Intravascular Ultrasound and Pulsed Doppler Velocimetry. *The American Journal of Cardiology* 1992;70(4):542-5.

Eichorn E, Heesch C, Barnett J, Alvarez L, Fass S, Grayburn P, et al. Effect of Metoprolol on Myocardial Function and Energetics in Patients with Non-Ischemic Dilated Cardiomyopathy: A Randomized, Double-Blind, Placebo-Controlled Study. *Journal of the American College of Cardiology* 1994;24(5):1310-20.

## Book Chapters

Complications of Laparoscopically Guided Inguinal Hernioplasty. Fass S, Phillips E. <u>Prostheses and Abdominal Wall Hernias.</u> Bendavid R, 2nd Edition.

Steven M. Fass, M.D., F.A.C.S.
5809 Long Court
Austin, TX. 78730
(512)241-0969
stevenfass@hotmail.com

**Presentations**

Breast Cancer: The Facts; American Cancer Society Tell a Friend; Austin, TX. September 26, 2001.

Laparoscopic Colon and Rectal Surgery, Grand Rounds; Seton Medical Center; Austin, TX. May 31, 2001

Common Breast Disorders in the Young Patient, Grand Rounds; University of Texas Health Center. March 7, 2001.

Gastroesophageal Disease and Nausea: Does Fundoplication Help or Hurt?, Western Surgical Association; Santa Fe, NM. November 16, 1999.

Laparoscopy for the Surgical Oncologist. Grand Rounds; University of Utah. March 17, 1999.

Delayed Recurrence of an Abdominal Cystic Lymphangioma. Southwestern Surgical Congress; San Antonio, Texas. April 19-22, 1998.

Intraoperative Radiation Therapy. Grand Rounds; University of Utah, April 15, 1998.

Colon and Rectal Trauma. Trauma Conference; University of Utah, November 17, 1998.

Choledochal Cysts. Gastroenterology Conference; University of Utah, June 11, 1997.

Confocal Microscopic Detection of HIV RNA Producing Cells. 29th Medical Student Research Forum; University of Texas Southwestern Medical School, January 1991.

**Organizations**

American Society for Metabolic & Bariatric Surgery
Society of American Gastrointestinal Endoscopic Surgeons
    (SAGES)
Travis County Medical Society
Texas Medical Association

# EXHIBIT 6

# EXHIBIT 7

# Shipp, Needham & Durham, LLC
Analysis of Economic Damages & Business Bankruptcies
6320 Southwest Boulevard, Suite 113
Fort Worth, TX 76109
817-348-0213 Telephone
817-348-0232 Facsimile

Allyn Needham Ph.D., CEA
aneedham@shippneedham.com
(817)915-9420 Cell

Shannon Shipp Ph.D, CEA
sshipp@shippneedham.com
(817)235-1945 Cell

December 4, 2014

Robert Hammer
Hammer & Associates
675 North Henderson, Suite 300
Fort Worth, TX 76107

RE: Beth MacNeill

Dear Mr. Hammer,

Thank you for the opportunity of working with you in the matter relating to Beth MacNeill. As agreed, I have estimated her lost earning capacity from 4/27/2012 through her projected retirement age. My calculations show a range of lost earning capacity from $1,153,536 to $1,511,773.

In preparing this report, my review included, but was not limited to, the following.
1) Plaintiff's Second Amended Complaint,
2) Beth MacNeill's form 1040 income tax returns for 2009, 2010, 2011, and 2012,
3) Beth MacNeill's Total Compensation Summary Statement: 2012 from Alcon.

In addition, I researched information from the following sources.
4) Social Security Administration, www.ssa.gov,
5) Internal Revenue Service, www.irs.gov,
6) Alcon careers and benefits, www.alcon.com,
7) Employer Costs for Employee Compensation – June 2014, USDL 14-1673, 9/10/2014, www.bls.gov,
8) Average U.S. Retirement Age Rises to 62, 4/28/2014, www.gallup.com,
9) Survey of Professional Forecasters, Federal Reserve Bank of Philadelphia, 11/17/2014, www.philadelphiafed.org,
10) U.S. Bond and Market Rates, 12/3/2014, www.Bloomberg.com,
11) U.S. Life Tables, National Center for Health Statistics.

I also spoke by telephone with Robert Hammer of Hammer and Associates and Mike Henry of Michael J. Henry, PC to clarify facts of this case.

This report was prepared solely by me. I have no current or anticipated future interests with any of the involved parties that would prevent me from providing an unbiased opinion. My compensation is not contingent on the opinions, analyses or conclusions in this report. This is a preliminary report and subject to change with new data or information.

The following assumptions have been made in this report.
1) Beth MacNeill is a single female.
2) Her date of birth is ▓▓▓▓▓ (1965.71)
3) At the time of her injury, she was working as Safety Monitor – Devices in the Research and Development Division of Alcon.
4) Her date of injury is 4/27/2012. (2012.32)
5) Since her injury, she has not returned to the workforce.
6) The below market discount rate method will be used to discount future losses to present value.
7) The date of estimate (i.e. the day to begin discounting) is 1/1/2015. (2015.00)

Lost Earning Capacity

Beth MacNeill's lost earning capacity is the difference between what she would have earned working at Alcon, had she not been injured, and what she can earn at her next job. It is my understanding that Ms. MacNeill has applied for work but has not been able to secure employment. This report will reflect her not securing new employment. I reserve the right to update this report for any changes in her employment status.

According to her tax returns, Beth MacNeill's income from 2009 through 2012 was as follows.

| Year | Income |
|------|--------|
| 2009 | 42,532 |
| 2010 | 39,397 |
| 2011 | 56,826 |
| 2012 | 65,586 |

The 2012 figure reflects only her reported income from Alcon.

Ms. MacNeill's compensation summary showed an annual salary of $72,000 for 2011 and $73,100 for 2012. The records appear to show Ms. MacNeill moving into her new position on 8/22/2011.

Two scenarios have been provided. Scenario I assumes a retirement age of 62. Scenario II assumes a retirement age of 67.

For both scenarios, Beth MacNeill's 2012 annual salary has been assumed to be $73,100. From this amount her reported income ($65,586) has been deducted. Her 2013 and 2014 salary has been held constant at $73,100.

2

Beginning in 2015, it has been assumed Ms. MacNeill would have received annual cost of living adjustments. This COLA has been assumed to be equal to the projected rate of future inflation. No merit or promotional pay increases have been included. The projected rate of future inflation (2.20%) has been taken from the Survey of Professional Forecasters that is published quarterly by the Federal Reserve Bank of Philadelphia. (11/17/2014, www.philadelphiafed.org)

Income taxes have been deducted from this income stream. The income tax calculator located on the Internal Revenue Service website was used to determine the effective amount of income taxes to be deducted from this income stream. (www.irs.gov)

Fringe benefits have been included in these calculations. Alcon provides a full benefit package to its employee. (Alcon, Careers, Benefits, www.alcon.com/careers-at-alcon/benefits.aspx)

Data from the Employer Costs for Employee Compensation – June 2014 (9/10/2014, www.bls.gov) has been used. Information for the west south central region provided the benefit figure. This region includes Texas. The benefit factor of 21.65% includes health coverage, life insurance, defined contribution plans, and legally required benefits (specifically Social Security and Medicare employer contributions).

Scenario I assumes a retirement age of 62. According to the Social Security Administration, approximately one half of the females in the U.S. make their initial request for retirement benefits at this age. (www.ssa.gov, Average U.S. Retirement Age Rise to Age 62, www.gallup.com)

Scenario II assumes a retirement age of 67. This is the age at which Ms. MacNeill would qualify for full Social Security retirement benefits. (www.ssa.gov)

The below market discount rate method has been used to discount future losses to present value. The below market discount rate is the difference between the current market interest rate and the projected rate of future inflation. For Scenario I, the current market rate is the weighted average yield on AAA rated, general obligation tax-exempt bonds maturing from 2014 through 2029. (U.S. Bond and Market Rates, 12/3/2014, www.Bloomberg.com) For Scenario II, the current market rate is the weighted average yield on AAA rated, general obligation tax-exempt bonds maturing between 2014 and 2034. (U.S. Bond and Market Rates, 12/3/2014, www.Bloomberg.com) The projected rate of future inflation was taken from the Survey of Professional Forecasters that is published quarterly by the Federal Reserve Bank of Philadelphia. (11/17/2014, www.philadelphiafed.org)

3

The results are as follows.

Scenario I

| | |
|---|---|
| Pre-Estimate Loss | 162,598 |
| Post Estimate Loss | 990,938 |
| Total Loss | 1,153,536 |

Scenario II

| | |
|---|---|
| Pre-Estimate Loss | 162,598 |
| Post Estimate Loss | 1,349,174 |
| Total Loss | 1,511,773 |

Spreadsheets containing these calculations are attached at the end of this report.

## Conclusion

Based on the information and assumptions discussed in this report and after applying techniques commonly used in the field of economics, I conclude that Beth MacNeill's lost earning capacity ranges from $1,153,536 to $1,511,773.

This is a preliminary report and subject to change with new data or information. It is my understanding that Ms. MacNeill is currently unemployed, but is seeking employment. I reserve the right to update this report for any change in her employment status.

Attached to this report are my current CV included continuing education, presentations and publications, a listing of prior testimonies and my fee schedule.

If you have any questions, please call me at 817.348.0213.

Sincerely,

Allyn Needham, Ph.D., CEA

Beth MacNeill                                                                                                           Page 5

Lost Earning Capacity                           Scenario I

| Date of Birth |  | 1965.71 | Annual Income | 73,100 | | Interest Rate | 2.08% |
| Date of Injury | 4/27/2012 | 2012.32 | Income Taxes | 11,600 | | Inflation Rate | 2.20% |
| Proj Date of Retire | 9/16/2027 | 2027.71 | Fringe Benefits | 21.65% | | Discount Rate | -0.12% |
| Proj Date of Death | 8/12/2048 | 2048.61 | | | | | |
| Date of Estimate | 1/1/2015 | 2015.00 | | | | | |

Pre-Estimate Loss

|  |  |  | + | - | + | = |  |
|  |  | Annual | Pro-Rated | Income | Fringe | | |
| Age | Year | Income | Income | Taxes | Benefits | Total | Cumulative |
| 47 | 2012.32 | 73,100 | 7,514 | 1,195 | 1,627 | 7,946 | 7,946 |
| 48 | 2013 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | 85,272 |
| 49 | 2014 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | 162,598 |
| | | Total | 153,714 | 24,395 | 33,279 | 162,598 | |

Post Esimate Loss

|  |  |  |  | + | - | + | = |  | = |  |
|  |  |  | Annual | Pro-Rated | Income | Fringe | | | Present | |
| Age | Time | Year | Income | Income | Taxes | Benefits | Total | | Value | Cumulative |
| 50 | 1 | 2015 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 77,419 | 77,419 |
| 51 | 2 | 2016 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 77,512 | 154,931 |
| 52 | 3 | 2017 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 77,605 | 232,536 |
| 53 | 4 | 2018 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 77,698 | 310,235 |
| 54 | 5 | 2019 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 77,792 | 388,027 |
| 55 | 6 | 2020 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 77,885 | 465,912 |
| 56 | 7 | 2021 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 77,979 | 543,891 |
| 57 | 8 | 2022 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 78,073 | 621,963 |
| 58 | 9 | 2023 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 78,166 | 700,129 |
| 59 | 10 | 2024 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 78,260 | 778,390 |
| 60 | 11 | 2025 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 78,354 | 856,744 |
| 61 | 12 | 2026 | 73,100 | 73,100 | 11,600 | 15,826 | 77,326 | | 78,448 | 935,192 |
| 62 | 12.71 | 2027.71 | 73,100 | 51,901 | 8,236 | 11,237 | 54,902 | | 55,746 | 990,938 |
| | | | Total | 929,101 | 147,436 | 201,150 | 982,815 | | 990,938 | |

| Pre-Estimate Loss | 162,598 |
| Post Estimate Loss | 990,938 |
| Total Loss | 1,153,536 |

Beth MacNeill                                                                                     Page 6

Lost Earning Capacity                          Scenario II

| Date of Birth      |           | 1965.71  | Annual Income   | 73,100  | Interest Rate  | 2.36% |
|--------------------|-----------|----------|-----------------|---------|----------------|-------|
| Date of Injury     | 4/27/2012 | 2012.32  | Income Taxes    | 11,600  | Inflation Rate | 2.20% |
| Proj Date of Retire| 9/16/2032 | 2032.71  | Fringe Benefits | 21.65%  | Discount Rate  | 0.16% |
| Proj Date of Death | 8/12/2048 | 2048.61  |                 |         |                |       |
| Date of Estimate   | 1/1/2015  | 2015.00  |                 |         |                |       |

Pre-Estimate Loss

|     |         |        | +         | -      | +        | =       |            |
|-----|---------|--------|-----------|--------|----------|---------|------------|
|     |         | Annual | Pro-Rated | Income | Fringe   |         |            |
| Age | Year    | Income | Income    | Taxes  | Benefits | Total   | Cumulative |
| 47  | 2012.32 | 73,100 | 7,514     | 1,195  | 1,627    | 7,946   | 7,946      |
| 48  | 2013    | 73,100 | 73,100    | 11,600 | 15,826   | 77,326  | 85,272     |
| 49  | 2014    | 73,100 | 73,100    | 11,600 | 15,826   | 77,326  | 162,598    |
|     |         | Total  | 153,714   | 24,395 | 33,279   | 162,598 |            |

Post Esimate Loss

|     |      |         |        | +         | -       | +        | =         | =         |            |
|-----|------|---------|--------|-----------|---------|----------|-----------|-----------|------------|
|     |      |         | Annual | Pro-Rated | Income  | Fringe   |           | Present   |            |
| Age | Time | Year    | Income | Income    | Taxes   | Benefits | Total     | Value     | Cumulative |
| 50  | 1    | 2015    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 77,203    | 77,203     |
| 51  | 2    | 2016    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 77,079    | 154,282    |
| 52  | 3    | 2017    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 76,956    | 231,238    |
| 53  | 4    | 2018    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 76,833    | 308,071    |
| 54  | 5    | 2019    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 76,710    | 384,782    |
| 55  | 6    | 2020    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 76,588    | 461,370    |
| 56  | 7    | 2021    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 76,466    | 537,835    |
| 57  | 8    | 2022    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 76,343    | 614,179    |
| 58  | 9    | 2023    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 76,222    | 690,400    |
| 59  | 10   | 2024    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 76,100    | 766,500    |
| 60  | 11   | 2025    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 75,978    | 842,478    |
| 61  | 12   | 2026    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 75,857    | 918,335    |
| 62  | 13   | 2027    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 75,736    | 994,071    |
| 63  | 14   | 2028    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 75,615    | 1,069,685  |
| 64  | 15   | 2029    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 75,494    | 1,145,179  |
| 65  | 16   | 2030    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 75,373    | 1,220,553  |
| 66  | 17   | 2031    | 73,100 | 73,100    | 11,600  | 15,826   | 77,326    | 75,253    | 1,295,805  |
| 67  | 17.71| 2032.71 | 73,100 | 51,901    | 8,236   | 11,237   | 54,902    | 53,369    | 1,349,174  |
|     |      |         | Total  | 1,294,601 | 205,436 | 280,281  | 1,369,446 | 1,349,174 |            |

| Pre-Estimate Loss  | 162,598   |
|--------------------|-----------|
| Post Estimate Loss | 1,349,174 |
| Total Loss         | 1,511,773 |