IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BETH CHANEY MACNEILL<br>*Plaintiff*<br><br>VS.<br><br>NIRMAL JAYASEELAN, M.D. AND<br>TEXAS HEALTH HARRIS METHODIST<br>HOSPITAL FORT WORTH<br><br>*Defendants* | § § § § § § § § § § § § § | CIVIL ACTION NO. 4-14CV-242-0 |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

**NOW COMES BETH CHANEY MACNEILL,** *Plaintiff* in the above-entitled and numbered cause, and files this Third Amended Complaint, pursuant to *Federal Rule of Civil Procedure 15(a)(2),* complaining of *Defendants*, **NIRMAL JAYASEELAN M.D. and TEXAS HEALTH HARRIS METHODIST HOSPITAL FORT WORTH** and for cause of action would respectfully show this Court the following:

### PARTIES

1.0   Plaintiff is a resident of Harrison, Boone County, Arkansas.

1.1   Defendant Nirmal Jayaseelan, M.D. has been served with process and has filed an answer herein. On the occasion in question, Nirmal Jayaseelan, M.D. was a physician licensed by the State of Texas to practice medicine and surgery and was providing medical and surgical services in Dallas, Dallas County, Texas. He held himself out and represented to the Plaintiff, and the public in general, that he was a competent and qualified physician specializing in

Bariatric and General Surgery. On the occasion in question, Beth Chaney MacNeill had a physician/patient relationship with Defendant Nirmal Jayaseelan, M.D.

1.2     Defendant Texas Health Harris Methodist Hospital Fort Worth has been served with process and has filed an answer herein. On the occasion in question, Texas Health Harris Methodist Hospital Fort Worth was licensed by the State of Texas to provide emergency medical and surgical services in Fort Worth, Tarrant County, Texas.  Texas Health Harris Methodist Hospital Fort Worth was a "participating hospital" as that term is defined by *42 USCS §1395dd(e)(2)*. It held itself out and represented to the Plaintiff, and the public in general, that it was a competent and qualified Level II emergency health care facility. On the occasion in question, Defendant Texas Health Harris Methodist Hospital Fort Worth, by and through its agents and/or employees, provided emergency medical services to the Plaintiff and Beth Chaney MacNeill had a hospital/patient relationship with Defendant Texas Health Harris Methodist Hospital Fort Worth.

## JURISDICTION AND VENUE

2.0     This Court has federal question jurisdiction over this action because Plaintiff's cause action arises under 42 U.S.C.A. § 1395dd "EMTALA".[1]

2.1     This Court has complete diversity jurisdiction over the parties to this action because no defendant is a resident of the same state as the Plaintiff.[2] Plaintiff is a resident of the State of Arkansas. Defendants Nirmal Jayaseelan, M.D. is a resident of the State of Texas.

2.2     The matter in controversy exceeds the sum or value of the Seventy-Five Thousand

---

[1] 28 U.S.C. §1331
[2] 28 U.S.C. §1332(a)(1)

Dollar ($75,000.00) minimum jurisdictional limits of this Court, exclusive of costs and interest.[3]

2.3   Venue is proper in the Northern District of Texas because a substantial part of the events or omissions giving rise to this claim occurred in the Northern District of Texas.[4]

## CONDITIONS PRECEDENT

3.0   Pursuant to Federal Rule of Civil Procedure 9(c), all conditions precedent have occurred or been performed.

3.1   Plaintiff asserts that Chapter 74 *Texas Civil Practice and Remedies Code* is preempted by the *Federal Rules of Civil Procedure.* In the alternative, the Plaintiff has fully complied with the provisions of the *Texas Civil Practice and Remedies Code §74.051 and §74.052* with regard to Defendant Nirmal Jayaseelan, M.D.  Plaintiff duly and properly notified Defendant Nirmal Jayaseelan, M.D. of her health care liability claim prior to the filing of this Petition and produced a §74.052(c) HIPAA compliant authorization.

3.2   Plaintiff claims that Defendant Texas Health Harris Methodist Hospital Fort Worth violated the *Emergency Medical Treatment and Active Labor Act 42 U.S.C.A. §1395dd* and therefore *Texas Civil Practice and Remedies Code §74.051 and §74.052* do not apply. In the alternative, Plaintiff has fully complied with the provisions of the *Texas Civil Practice and Remedies Code §74.051* and *§74.052* by duly and properly notifying this Defendant of this health care liability claim prior to the filing of this Complaint and by producing a HIPAA compliant authorization.

## STATEMENT OF FACTS

4.0   In June 2005, Defendant Nirmal Jayaseelan, M.D. performed a lap-band procedure on Plaintiff.  The lap-band is an adjustable device, surgically placed around the top of

---

[3] 28 U.S.C. §1332(a)
[4] 28 U.S.C. §1391(a)(2)

the stomach [fundus] just below the gastroesophageal junction.  It restricts the flow of food from the esophagus into the stomach resulting in weight loss.  The stricture of the lap band can be adjusted by filling or withdrawing saline through a port.

   4.1  In April 2012, Plaintiff called Nirmal Jayaseelan M.D.'s office to inquire about adjusting the lap band with a "fill".  Dr. Jayaseelan's office scheduled Plaintiff for an office evaluation and endoscopy [EGD].

   4.2  Plaintiff's endoscopy results were essentially normal.[5] The upper, mid, and lower esophagus were normal without any evidence of masses, ulcerations, tears, or esophagitis.[6] The body of the stomach was normal, without any evidence of polyps, masses, ulcerations or duodenitis[7]. There was no evidence of any gastric erosions, masses, or ulcerations in the cardia of the stomach[8] and she did not have gross esophagitus.[9] Dr. Jayaseelan did not perform esophageal manometry.[10] In summary, the endoscopy did not show evidence of GERD.

   4.3  On April 25, 2012, Plaintiff presented to Dr. Jayaseelan's office for evaluation. The medical records confirm that Plaintiff did not have any symptoms of GERD. She did not have nausea, difficulty swallowing, acid reflux, night cough, epigastric pain.[11], abdominal pain, sensation of pressure in her chest, vomiting, or spitting up.[12] Imaging studies also ruled out a prolapse.[13]

---

[5] App. 1, p. 3-4, Jayaseelan Dep. p. 39 Lines 8-21, p. 40, Lines 3-6, p. 41 Lines 9-12.
[6] App. 1, p.3, Jayaseelan Dep. p.39, Lines 11-14.
[7] App. 1, p.3, Jayaseelan Dep. p. 39, Lines 15-25, p. 40, Lines 1-2,
[8] App. 1, p.3, Jayaseelan Dep. p.40, Line 3-6.
[9] App. 1, p.4, Jayaseelan Dep. p. 41, Lines 9-12.
[10] App. 1, p.3-4, Jayaseelan Dep. p.40, Line 25, p. 41, Line 1.
[11] App. 1, p. 4, Jayaseelan Dep. p. 44, Lines 11-14.
[12] App. 1, p. 4, Jayaseelan Dep. p. 44, Lines 4-9.
[13] App. 1, p.5, Jayaseelan Dep. p. 47, Line 25, p. 48, Lines 1-2.

4.4     Dr. Jayaseelan's record reflects that the reason for Plaintiff's appointment was for a possible lap-band fill.[14] The Procedures category of the medical records states that the "patient is post-gastric band surgery now complaining of increased hunger and able to eat larger volumes of food, and not losing weight. Band adjustment is indicated."[15] The office record then describes that "the abdomen was prepped in a sterile fashion. 1% lidocaine was used for local anesthesia over the port. The port was accessed under x-ray, using a non-coring needle, Huber needle, and saline was added to the band."[16] In direct contradiction to the medical records, this procedure was not done.

4.5     Dr. Jayaseelan did not perform a lap-band fill on April 25, 2012.[17] Instead, he scheduled Plaintiff for surgery on April 27, 2012.

4.6     Dr. Jayaseelan's April 27, 2012 operative report identifies the procedure performed as a "laparoscopic fundo plication" for "worsening gastroesophageal reflux symptoms".[18]

4.7     Dr. Jayaseelan misrepresented the preoperative and postoperative diagnosis as "gastroesophageal reflux disease".[19] The endoscopy and absence of symptoms confirms that Plaintiff did not have gastroesophageal reflux disease.

4.8     Dr. Jayaseelan's operative report does not describe the surgical procedure performed or the surgical technique he used.[20] He does not describe any plication of the stomach below the lap-band.[21] The operative report does not describe a "prolapse" or "lap-band

---

[14] App. 1, p.4, Jayaseelan Dep. p. 43, Lines 23-25.
[15] App. 1, p.15.
[16] App. 1, p. 15.
[17] App. 1. p.19. MacNeill Dep. p. 42, Lines 1-4,
[18] App.1, p.17.
[19] App. 1, p.17.
[20] App. 1, p.9, Jayaseelan Dep. p. 67, Lines 3-25.
[21] App. 1, p.9, Jayaseelan Dep. p. 67, Lines 3-25.

slippage".[22] He simply states that "a fundoplication was done . . . ".[23]

    4.9    Plaintiff consented to and authorized a "laparoscopic Nissen fundoplication".[24] Yet, Dr. Jayaseelan did not perform a "laparoscopic Nissen fundoplication".[25]

    4.10    A Nissen fundoplication "fundoplasty" is a procedure where the surgeon wraps the upper stomach around the lower esophagus, creating a valve for GERD.[26]

    4.11    Dr. Jayaseelan did not perform a fundoplication or a laparoscopic Nissen fundoplication as represented in the medical records. The terms fundoplication and gastric plication are not used synonymously.[27] A Nissen fundoplication "fundoplasty" can only be performed on someone without a lap-band.[28] Plaintiff had a lap-band and the lap-band was not removed . It was impossible to do a laparoscopic Nissen fundoplication on Plaintiff with her lap-band in place.[29]

    4.12    Perforation of the stomach is a risk of laparoscopic Nissen fundoplication procedure.[30] The April 27, 2012 Disclosure and Consent form does not identify perforation of the stomach as a potential risk.[31] Plaintiff was not informed of the risk of stomach perforation.

    4.13    The surgical procedure proximately caused Plaintiff's stomach perforation.

    4.14    Defendant Jayaseelan did not perform the procedure he represented in the operative report. He did not perform the procedure he represented in the Disclosure and Consent Form and he did not perform the procedure he represented in his billing records.[32]

---

[22] App. 1, p.17.
[23] App. 1, p.17.
[24] App.1, p.12, Jayaseelan Dep. p. 80, Lines 20-24.
[25] App.1 p.12, Jayaseelan Dep. p. 80, Lines 23-24.
[26] App. 1, p. 13, Jayaseelan Dep. p. 81 Lines 2-7.
[27] App. 1, p. 11, Jayaseelan Dep. p. 73, Lines 18-23.
[28] App. 1, p.7, Jayaseelan Dep. p. 53, Lines 10-18.
[29] App. 1, p.13, Jayaseelan Dep. p. 81, Lines 8-10.
[30] App. 1, p. 2, Jayaseelan Dep.p.36, Lines 1-5.
[31] App. 1, p. 18.
[32] App. 1, p. 9, Jayaseelan Dep. p. 67, Lines 3-9.

4.15 The medical records do not identify or describe the procedure he actually performed.[33] One hundred and sixty-three (163) days after Dr. Jayaseelan filed his original Answer, he admitted that the procedure he actually performed was not described in the medical records.[34] After Dr. Jayaseelan filed his original Answer, he described the surgical procedure performed as a gastric imbrication and described the surgical technique he used.[35] Gastric imbrication was an experimental procedure and reasonable and prudent surgeons would not recommend it under the Plaintiff's circumstances.

4.16 Dr. Jayaseelan intentionally misrepresented the surgical procedure performed in his operative note and he intentionally left out of his operative report any description of the surgical procedure actually performed.[36] This conduct constitutes fraud and fraudulent concealment.

4.17 On April 28, 2012, Plaintiff Beth MacNeill developed severe abdominal pain. Med Star Emergency Medical Services records document that Plaintiff experienced an unprovoked, sudden onset of sharp lower quadrant abdominal pain that she described as a 10 on a scale of 1-10. She was tachycardic at 143 bpm. Plaintiff's pain was so severe that Med Star Emergency Medical Services administered 100 mcg of fentanyl and 4mg of Zofran. Plaintiff presented to Harris Methodist Hospital Fort Worth Emergency Department and requested examination and treatment.

4.18 In April 2012, Texas Health Harris Methodist Hospital Fort Worth was a Level II Trauma Center and it held itself out and represented to the public that it provided Level II emergency medical services. Texas Health Harris Methodist Hospital Fort Worth was a

---

[33] App. 1, p. 9, Jayaseelan Dep. p. 67, Lines 3-9.
[34] App. 1, p. 9, Jayaseelan Dep. p. 67, Lines 3-9.
[35] App. 1, p. 9, Jayaseelan Dep. p. 67, Lines 3-9.
[36] App. 1, p.9, Jayaseelan Dep. p. 67, Lines 3-25.

"participating hospital" as that term is defined by *42 USCS §1395dd(e)(2)*. It held itself out and represented to the Plaintiff that it was a competent and qualified Level II emergency health care facility.

4.19   In addition to severe abdominal pain, Plaintiff presented with signs and symptoms of a gastric perforation.  She had a history of gastric surgery within 24 hours. She was tachycardic. She had tenderness in the right lower quadrant, epigastric area and the left lower quadrant. She had nausea and vomiting without diarrhea and she had leukocytosis with a left shift. Plaintiff was evaluated by Neal Bevan Talbot, M.D. Dr. Talbot requested a routine CT imaging study of the abdomen and pelvis. Harris Methodist Hospital's CT protocol required GI contrast. Dr. Talbot ordered the CT imaging study without GI contrast. The CT image showed pneumoperitoneum and ascites.  Pneumoperitoneum and ascites are indicative of a perforation. Gastric perforation is a surgical emergency. A delay in repairing a gastric perforation will likely cause a material deterioration of the patient's condition. Even though the radiologist recommended "close follow up to exclude the possibility of a leak," Texas Health Harris Methodist Hospital Fort Worth did not admit her, request a surgical consultation, or obtain a follow up CT image with GI contrast.  Texas Health Harris Methodist Hospital Fort Worth discharged her home.

4.20   Less than twelve hours later on April 29, 2012, Plaintiff presented to Baylor All Saints Medical Center at Fort Worth Emergency Department via ambulance in septic shock.

4.21   Medical screening examination indicated that Plaintiff's medical condition had materially deteriorated and was emergent. Her abdomen was distended. She was diffusely tender to palpation, hypotensive, tachycardic and lactated at 9.37. She was in acute renal failure. Her creatinine was 2.5. She was hyperkalemic and her potassium was over 5. Baylor All Saints

Medical Center at Fort Worth Emergency Department admitted Plaintiff to Baylor's Intensive Care Unit.

 4.22 Once in intensive care, Dr. Asha Abraham requested a surgical consultation from a general surgeon, Domingo Tan, M.D. Dr. Tan ordered a CT image with GI contrast. The image study showed gross pneumoperitoneum and massive ascites indicative of a perforation. Dr. Tan recognized the probability of a gastric leak and requested a bariatric consultation from Chad Carlton M.D. Dr. Carlton initiated efforts to stabilize Ms. MacNeill including pushing fluid volumes, pressor support, ventilation and placement of a NG tube. Once stabilized, he initiated efforts to transfer Plaintiff to Dr. Jayaseelan.

 4.23 April 29, 2012 was a Sunday and Defendant Nirmal Jayaseelan, M.D. was not on call.  John Winter, M.D. was covering for Dr. Jayaseelan that weekend but Dr. Winter was not a bariatric surgeon and he refused to accept Plaintiff's transfer to Forest Park Medical Center.

 4.24 The gastric surgery and the delay in the surgical repair of the gastric perforation caused or contributed to cause injuries and damages to Plaintiff.

## STATEMENT OF THE CLAIMS

### Nirmal Jayaseelan, M.D.

 5.0 Nirmal Jayaseelan, M.D. committed multiple acts or omissions of fraud and concealed these acts and omissions until his deposition of October 17, 2014. Nirmal Jayaseelan, M.D. had a duty to disclose Plaintiff's preoperative diagnosis and the surgical procedure performed. He had a duty to inform Plaintiff of the risks of the procedure performed. He had a duty to disclose through documentation in his operative report, a description of the operative procedure. Until his deposition of October 17, 2014, Nirmal Jayaseelan, M.D. fraudulently concealed the surgical procedure actually performed.  His operative report identifies the surgical

procedure performed as a fundoplication.[37] He actually performed a gastric imbrication.[38] He fraudulently concealed a description of the procedure actually performed by submitting a vague and nondescript operative report. His operative report simply states "a fundoplication was done".[39] He actually imbricated the stomach below the lap-band.[40] He intentionally failed to describe the procedure he actually performed.[41] He fraudulently misrepresented the preoperative diagnosis. He identified the preoperative diagnosis as "gastroesophageal reflux disease".[42] The preoperative endoscopy and lack of symptoms rule out GERD.[43] He misrepresented the procedure to be performed in the Consent and Disclosure form. The Consent form identifies the procedure as "laparoscopic Nissen fundoplication".[44] He did not perform a laparoscopic Nissen fundoplication.[45] He performed a gastric imbrication.[46] These acts and omissions of fraud concealed the facts and the existence of Plaintiff's cause of action.

    5.1    On the occasion in question, Nirmal Jayaseelan, M.D. also committed one or more of the following acts and/or omissions of negligence:

        5.2    He diagnosed Plaintiff with GERD.

        5.3    He surgically treated Plaintiff for GERD.

        5.4    He failed to disclose that the procedure performed was experimental.

        5.5    He failed to disclose the risks and hazards involved in the surgical procedure rendered which could have influenced a reasonable person in making a decision to give or withhold consent.

---

[37] App. 1, p.17.
[38] App. 1, p.9, Jayaseelan Dep. P. 67, Lines 3-9.
[39] App. 1, p.17.
[40] App. 1, p.9, Jayaseelan Dep. P. 67, Lines 21-25.
[41] App. 1, p. 9, Jayaseelan Dep. p. 67, Lines 3-9.
[42] App. 1, p.17.
[43] App. 1, p.3, Jayaseelan Dep. p.39, Lines 11-14; App. 1, p.2, Jayaseelan Dep. p. 39, Lines 15-25, p. 40, Lines 1-2; App. 1, p.3, Jayaseelan Dep. p.40, Line 3-6; App. 1, p.3, Jayaseelan Dep. p. 41, Lines 9-12.
[44] App. 1, p. 12, Jayaseelan Dep. p. 80, Lines 20-24.
[45] App. 1 p. 12, Jayaseelan Dep. p. 80, Lines 23-24.
[46] App. 1, p. 9, Jayaseelan Dep. p. 67, Lines 3-9.

    5.6    He failed to disclose the risks and hazards of stomach perforation involved in the surgical procedure rendered which could have influenced a reasonable person in making a decision to give or withhold consent.

    5.7    He failed to provide adequate coverage for his bariatric patients on April 28th and April 29th, 2012.

    5.8    He failed to obtain Plaintiff's informed consent for the procedure performed.

    5.9    He performed a gastric imbrication with a lap-band.

5.10    The acts and/or omissions of Nirmal Jayaseelan, M.D. jointly and severally caused or contributed to cause injuries and damages to the Plaintiff.

## *42 U.S.C.A. § 1395dd "EMTALA"*

6.0    The *Emergency Medical Treatment and Active Labor Act 42 U.S.C.A. §1395dd* requires that if an individual comes to a hospital's emergency department and requests examination and treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition exits. *42 U.S.C.A. §1395dd(a)*

6.1    If the hospital determines that the individual has an emergency medical condition, the hospital must provide either-- A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or B) for transfer of the individual to another medical facility in accordance with subsection (c) *42 U.S.C.A. §1395dd(b)(1)(A)(B)*.

6.2    Subsection (c) restricts the transfer of the individual if the emergency medical condition has not been stabilized. *42 U.S.C.A. §1395dd(c)*.

6.3    The term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of immediate medical

attention could reasonably be expected to result in placing the health of the individual in serious jeopardy, serious impairment to bodily functions or serious dysfunction of any bodily organ or part. *42 U.S.C.A. §1395dd(e)(1)(A)(i-iii)*

  6.4  The term "stabilize" means to provide such medical treatment of the condition as was necessary to assure, within reasonable medical probability, that no material deterioration of her condition was likely to result from or occur during the transfer of the individual from a facility. *42 U.S.C.A. §1395dd(e)(3)(B)*.

  6.5  Within the context of EMTALA, statutory liability is imputed to the hospital based on the actions and decisions of the hospital's emergency physician's, support staff and any healthcare providers ancillary to the emergency department. A hospital is liable for the emergency medicine physician's conduct and decisions regarding screening, stabilization, and transfer because the hospital can only act, and thereby comply with EMTALA's requirements, by relying on the actions of its physicians and hospital staff. Any EMTALA violation by a physician, staff or healthcare provider ancillary to the emergency department is also a violation by the hospital.[47]

  6.6  EMTALA requires a hospital to develop policies or procedures for medical screening examinations, but it leaves it up to the hospital to decide whether to adopt a symptom-specific or general approach.[48] Regardless of the type of approach, EMTALA requires that the hospital consistently apply its policies and procedures.[49] If a hospital has a substantive and detailed protocol, it must administer the content of that protocol uniformly.[50]

---

[47] *Burditt v. U.S. HHS*, 934 F.2d 1362, 1374 (5th Cir. 1991).
[48] *Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F.Supp.2d 464, 492 (S.D. Tex. 2009).
[49] *Id.*
[50] *Id.*

## Texas Health Harris Methodist Hospital Fort Worth EMTALA Violations

7.0    In April 2012, Harris had adopted a specific policy for Emergency Medical Screening and Patient Transfers.[51] The policy defines a "medical screening exam" as the process to determine, with reasonable clinical confidence, whether the patient is suffering from an emergency medical condition.[52] The policy stated that the physician shall determine if an emergency medical condition exists and, if so, initiate necessary stabilizing treatment.[53]  An emergency medical condition is considered to be stabilized when the emergency medical condition has been resolved.[54]  Additionally, the policy defines stabilization, with respect to an emergency medical condition, as when the individual is provided such medical treatment as is necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result.[55]  According to Harris' policy, a patient is considered "stable for discharge" when, within reasonable clinical confidence, it is determined that the individual has reached the point where his or her continued care, including diagnostic work-up and/or treatment, could be reasonably performed as an outpatient or later as an inpatient, provided the individual is given a plan for appropriate follow-up care with discharge instructions.[56]

7.1    In April 2012, Harris had also adopted a specific protocol for requesting routine CT images of the abdomen & pelvis.  This protocol required the administration of GI contrast.[57] The protocol also required that "[i]f deviation must be made and time does not allow for physician approval, reason for deviation must be adequately documented along with a

---

[51] App. 1, p.20.
[52] App. 1, p.23, 8.9.
[53] App. 1, p.21, 4.4.3.3.
[54] App. 1, p.22, 4.5.
[55] App. 1, p.24, 8.12.
[56] App. 1, p.24, 8.14.2.
[57] App. 1, p.25.

description of the reasoning for the deviation".[58]

    7.2    Accordingly, Texas Health Harris Methodist Hospital Fort Worth failed to administer the content of its' policy and protocol uniformly and therefore violated EMTALA as follows:

    7.3    Harris failed to determine if Plaintiff had an emergency medical condition. Plaintiff had a stomach perforation which is a surgical emergency;

    7.4    Harris failed to stabilize Plaintiff. At the time of discharge, Beth MacNeill was tachycardic. She had leukocytosis with a left shift. She had pain in the left lower quadrant, right lower quadrant and epigastric area. She had ascites and pneumoperitoneum. She had a stomach perforation.

    7.5    Harris failed to provide an appropriate medical screening examination to Plaintiff.

    7.6    Harris failed to administer GI Contrast for the CT image of the abdomen and pelvis.

    7.7    Harris failed to adequately document a reason for deviating from the CT of the abdomen & pelvis protocol.

    7.8    Harris failed to initiate necessary stabilizing treatment.

    7.9    Harris discharged Plaintiff prior to resolving her medical condition. At the time of discharge, Plaintiff was tachycardic. She had leukocytosis with a left shift. She had pain in the left lower quadrant, right lower quadrant and epigastric area. She had ascites and pneumoperitoneum. She had a stomach perforation.

    7.10    Harris failed to assure, within reasonable medical probability, that no material deterioration of Plaintiff's condition was likely to result. The radiologist's impression was that "close follow-up was necessary to exclude the possibility of a leak. Less than 12 hours later, she presented to Baylor All Saints Medical Center Emergency Department in septic shock, hypotension, with massive ascites, gross pneumoperitoneum, and acute renal failure.

    7.11    Harris failed to determine, within reasonable clinical confidence, that Plaintiff has reached the point where her continued care, including diagnostic work-up and/or treatment, could be reasonably performed as an

---

[58] App.1, p.25.

       outpatient or later as an inpatient. At the time of discharge, Plaintiff was tachycardic. She had leukocytosis with a left shift. She had pain in the left lower quadrant, right lower quadrant and epigastric area. She had ascites and pneumoperitoneum. Less than 12 hours later, she presented to Baylor All Saints Medical Center Emergency Department in septic shock, hypotension, with massive ascites, gross pneumoperitoneum, and acute renal failure.

    7.12    Harris failed to provide the Plaintiff a plan for appropriate follow-up care with discharge instructions.

    7.13    Harris failed to determine, within reasonable clinical confidence, that Beth MacNeill did not have a leak.

    7.14    Harris did not provide Plaintiff close follow up to exclude the possibility of a leak.

**Texas Health Harris Methodist Hospital Fort Worth Negligent Acts and/or Omissions**

    8.0    Pleading hypothetically and in the alternative, pursuant to FRCP 8(d)(2), if this is not an EMTALA case then the health care providers within Texas Health Harris Methodist Hospital Fort Worth Emergency Department were acting as agents, employees or associates of Texas Health Harris Methodist Hospital Fort Worth and were acting within the scope of their authority as such agents, employees or associates of Texas Health Harris Methodist Hospital Fort Worth. Plaintiff had a reasonable belief that the healthcare providers within the Emergency Department were authorized by Texas Health Harris Methodist Hospital Fort Worth to act on its behalf.  Accordingly, Texas Health Harris Methodist Hospital Fort Worth is responsible for the acts or omissions of its agents, employees or associates under the principals of agency.

    8.1    Pleading hypothetically and in the alternative, pursuant to FRCP 8(d)(2), Texas Health Harris Methodist Hospital Fort Worth, by and through its agents, servants or employees, committed one or more of the following acts and/or omissions of wilful and wanton negligence:

        8.2    Texas Health Harris Methodist Hospital Fort Worth failed to properly evaluate, diagnose and treat Plaintiff's medical condition;

      8.3    Texas Health Harris Methodist Hospital Fort Worth failed to obtain a CT image with GI contrast;

      8.4    Texas Health Harris Methodist Hospital Fort Worth failed to recognize that Plaintiff's medical condition was emergent;

      8.5    Texas Health Harris Methodist Hospital Fort Worth discharged Beth MacNeill with an emergency medical condition;

      8.6    These acts or omissions of Texas Health Harris Methodist Hospital Fort Worth, by and through its agents, servants or employees, departed from the ordinary standard of care to such an extent that they, jointly and severally created an extreme degree of risk and likelihood of serious injury to the Plaintiff considering the probability and magnitude of the potential harm. Texas Health Harris Methodist Hospital Fort Worth, by and through its agents, servants or employees, knew or should have known of the risk involved and chose to proceed in conscious indifference to the rights, safety, or welfare of Plaintiff. This conduct caused or contributed to cause Plaintiff's injuries and damages.

## DAMAGES

      9.0    As a direct and proximate result of the Defendants' acts and/or omissions, Beth Chaney MacNeill, has suffered past, present and future injuries and damages including, but not necessarily limited to, reasonable and necessary medical expenses, conscious physical pain and suffering, physical disability, physical disfigurement, mental anguish, emotional harm, lost earnings and loss of earning capacity. The amount of the above-described damages are substantially in excess of the minimum jurisdictional limits of this Court.

## DEMAND FOR JURY

      10.0    Plaintiff has complied with the requirements of FRCP 38 (b) and 5 (d).

## DEMAND FOR JUDGMENT

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Beth Chaney MacNeill prays that the *Defendants* be cited to appear and answer herein, and that Plaintiff has judgment, jointly and severally, against such *Defendants* as follows:

(1) That Plaintiff, Beth Chaney MacNeill recover of and from the *Defendants* judgment for the above-described past and/or future injuries and damages in an amount in excess of the minimum jurisdictional limits of this Court;

(2) That Plaintiff Beth Chaney MacNeill, recover pre-judgment interest on the amount accrued beginning on the 180th day after the date the *Defendants* receive written notice of claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered;

(3) That Plaintiff, Beth Chaney MacNeill, recover post-judgment interest on the amount due at the highest legal rate allowed by law from the date of judgment until paid; and

(4) That Plaintiff, Beth Chaney MacNeill, recover all costs of Court, and such other and further relief, at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully Submitted,

By /s/ Robert Hammer
    **Robert W. Hammer**
    State Bar No.: 08854780

    **Michael J. Henry**
    State Bar. No.: 09482300

**ROBERT W. HAMMER**
675 North Henderson, Suite 300
Fort Worth, Texas 76107
Telephone 817/ 332-8266
Telefax   817/ 332-8708
robert@rhammerlaw.com

                AND

**MICHAEL J. HENRY P.C.**
675 North Henderson, Suite 300
Fort Worth, Texas  76107
Telephone  817/ 877-3303
Telefax      817/ 338-9109
henry@henrytexlaw.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2014, I electronically filed the foregoing with the Clerk for the U.S. District Court, Northern District of Texas, using the ECF system which will send notification of such filing to the following counsel of record:

Gregory P. Blaies
James W. Hryekewicz
BLAIES & HIGHTOWER
421 W. Third Street, Suite 900
Fort Worth, Texas 76102
gregblaies@bhilaw.com
jwh@bhilaw.com

Jeffrey W. Ryan
CHAMBLEE & RYAN P.C.
2777 N. Stemmons Frwy., Suite 1157
Dallas, Texas 75207
jwryan@chambleeryan.com

                /s/ Robert Hammer_____
                **Robert W. Hammer**