**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **BETH CHANEY MACNEILL** | § | |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | |
| | § | |
| | § | **CIVIL ACTION NO. 4-14CV-242-0** |
| **TEXAS HEALTH HARRIS METHODIST** | § | |
| **HOSPITAL FORT WORTH** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| *Defendant* | | |

## PLAINTIFF'S THIRD AMENDED  COMPLAINT

**NOW COMES BETH CHANEY MACNEILL,** *Plaintiff* in the above-entitled and numbered cause, and files this Third Amended Complaint, pursuant to Federal Rule of Civil Procedure 15(a)(2)*,* complaining of *Defendant*, **TEXAS HEALTH HARRIS METHODIST HOSPITAL FORT WORTH** and for cause of action would respectfully show this Court the following:

### PARTIES

1.0    Plaintiff Beth Chaney MacNeill (MacNeill or Plaintiff) is a resident of Harrison, Boone County, Arkansas.

1.1    Defendant Texas Health Harris Methodist Hospital Fort Worth (Harris or Defendant) is a Texas Corporation licensed by the State of Texas to provide health care including emergency medical services in Fort Worth, Tarrant County, Texas. On the occasion in question, Harris provided emergency medical services to the Plaintiff, by and through its agents

and/or employees and Plaintiff had a hospital/patient relationship with Defendant. Defendant has been served with process and has filed an answer herein.

## JURISDICTION AND VENUE

2.0     This Court has federal question jurisdiction over this action because Plaintiff's cause of action arises under the Emergency Medical Treatment and Active Labor Act 42 U.S.C.A. § 1395dd (EMTALA).[1]

2.1     This Court has complete diversity jurisdiction over the parties to this action.[2] Plaintiff is a resident of the State of Arkansas; and, Defendant is a Texas Corporation with its principle place of business in Fort Worth, Texas.

2.2     The matter in controversy exceeds the sum or value of the Seventy-Five Thousand Dollar ($75,000.00) minimum jurisdictional limits of this Court, exclusive of costs and interest.[3]

2.3     Venue is proper in the Northern District of Texas because a substantial part of the events or omissions giving rise to this claim occurred in the Northern District of Texas.[4]

## CONDITIONS PRECEDENT

3.0     Pursuant to Federal Rule of Civil Procedure 9(c), all conditions precedent have occurred or been performed.

3.1     Plaintiff claims that Defendant violated EMTALA and therefore, that Texas Civil Practice and Remedies Code sections 74.051 and 74.052 do not apply. In the alternative, Plaintiff has fully complied with the provisions of Texas Civil Practice and Remedies Code sections 74.051 and  74.052 by duly and properly notifying Defendant of this health care liability claim prior to the filing of this Complaint and by producing a HIPAA compliant authorization.

---

[1] 28 U.S.C.A. §1331
[2] 28 U.S.C.A. §1332(a)(1)
[3] 28 U.S.C.A. §1332(a)
[4] 28 U.S.C.A. §1391(a)(2)

## STATEMENT OF THE CLAIM

4.0     This is an EMTALA claim against Defendant. At the time of the incident made the basis of this claim, Defendant was a "participating hospital" as that term is defined by 42 U.S.C.A. section 1395dd(e)(2).  And, Defendant held itself out and represented to the Plaintiff and the public, in general, that it provided Level II emergency medical services.

4.1     On April 29, 2012 at 12:08 a.m., MacNeill presented to Harris's Emergency Department (Harris ED) and requested examination and treatment for an emergency medical condition. Harris ED, who accepted MacNeill as a patient, failed to provide MacNeill with an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition existed. MacNeill was not provided the same medical screening examination that Harris ED provided to other patients with the same signs, symptoms and differential diagnoses. An analysis of 1,020 Harris ED patient charts shows that MacNeill received a medical screening examination that significantly differed from the medical screening examinations of other Harris ED patients with the same signs, symptoms and differential diagnoses as MacNeill.

4.2     As a consequence of Harris ED's  disparate medical screening examination, Harris failed to determine whether or not an emergency medical condition existed as required by 42 U.S.C. §1395dd(a); its own Emergency Medical Screening Policy section 4.4.3.3. (Harris Policy); and as recognized in  *Baber v. Hospital Corp. of Am.*, 977 F.2d 872 879 (4th Cir. 1992).

4.3     While at Harris ED, MacNeill had an emergency medical condition that was not stabilized and Harris, by and through its emergency department physician and staff, had actual knowledge of this emergency medical condition.

4.4     Moreover, Harris's ED discharged MacNeill with an unstablized emergency medical condition.

4.5     As a direct result of Harris's violations of 42 U.S.C. § 1395dd (a) and (c), MacNeill suffered personal injuries and damages entitling her to damages under Texas law allowed by 42 U.S.C. §1395dd(d)(2)(A).

## STATEMENT OF FACTS

5.0     On April 27, 2012, Nirmal Jayaseelan M.D. performed a gastric plication procedure on MacNeill's stomach. Stomach perforations or leaks are possible complications of such procedures. Post-operatively, MacNeill was stable, and she was discharged home that same day.

5.1     At approximately 11:00 p.m. on April 28, 2012, MacNeill experienced an unprovoked, sudden onset of sharp pain in her lower abdomen.[5] The pain was so severe that she contacted MedStar Emergency Medical Services.[6] MedStar found MacNeill "on the floor in the back bedroom."[7] MedStar noted that MacNeill was in obvious pain, that she registered a 10/10 on a pain assessment scale, and that she was also tachycardic with a heart rate of 143 beats per minute (bpm).[8] Because MacNeill's pain was so severe, MedStar gave her 100 mcg of fentanyl.[9] MedStar then transported MacNeill to Harris ED.[10]

5.2     At Harris ED, MacNeill requested emergency medical services and Harris ED accepted her as a patient at 12:08 a.m. on April 29th 2012.[11] Harris ED's triage nurse recorded

---

[5] MacNeill bates #000054
[6] MacNeill bates #000054
[7] MacNeill bates #000054
[8] MacNeill bates #000063
[9] MacNeill bates #000054
[10] MacNeill bates #000054
[11] MacNeill bates #000001

MacNeill's chief complaint as "[a]bdominal pain" and her heart rate at 120 bpm.[12]

5.3    Harris ED's records document MacNeill's "HPI" (history of present illness) as "12:17 AM Beth MacNeill is a 46 y.o. female who presents to the ED c/o abd pain that radiates to her left shoulder onset earlier today. Pt states she recently has a hysterectomy 2 weeks ago, and a gastric sleeve placement yesterday. Pt also c/o CP and N/V earlier today. Pt has taken flexeril with no relief. Pt rates pain as 5/10. Pt has no other complaints at this time."[13]

5.4    Harris ED physician Neal Bevan Talbott M.D. evaluated MacNeill's condition. After reviewing the nursing notes and vital signs, Dr. Talbott performed a physical examination.[14] Dr. Talbott's physical exam confirmed that MacNeill was tachycardic[15] and had abdominal tenderness in the right lower quadrant, epigastric area and left lower quadrant. Dr. Talbott's differential diagnosis included "surgical complications"[16], "perforation"[17], "leaking"[18] and "small bowel obstruction."[19]

5.5    Dr. Talbott ordered a CT image with IV contrast. He did not order a CT image with oral contrast.  Attending radiologist, John Paul Evans M.D., reported "a moderate amount of ascites" and a "minimal amount of extraluminal gas."[24] Ascites and extraluminal gas or pneumoperitoneum can be indicative of a perforation.[25] Dr. Evans also noted that "[n]o enteric contrast administered for the study" and "close follow up is necessary to exclude the possibility of a leak" (emphasis added).[26]

---

[12] MacNeill bates #000009
[13] MacNeill bates #000007
[14] MacNeill bates #000009
[15] Talbott Depo. Page 47 Line 1-11
[16] Talbott Depo. Page 51 Line 13
[17] Talbott Depo. Page 43 Line 9-11
[18] Talbott Depo. Page 51 Line 15
[19] Talbott Depo. Page 51 Line 12
[24] MacNeill bates #000021-23
[25] Evans Depo. Page 33 Line 1-14
[26] MacNeill bates #000021-23

5.7     Comparable Harris ED records show that examining physicians <u>routinely</u> send a patient back to repeat a CT imaging study with oral contrast, when a radiologist is concerned about the possibility of a leak.[27] As reported, the radiologist was concerned about the possibility of a leak yet the hospital staff and examining physician Talbot did not perform the routine screening procedure, a CT imaging study <u>with oral contrast</u>.

5.8     While at Harris ED, MacNeill was tachycardic and her tachycardia was of sufficient severity to be emergent. At 1:00 a.m. on April 29, 2015, her heart rate was 138 bpm.[28] At 1:30 a.m. her heart rate increased to 152 bpm.[29] At 2:09 a.m. her heart rate was 153 bpm.[30] At 2:55 a.m. her heart rate was 143 bpm.[31] And, at 4:53 her heart rate was 146 bpm.[32] MacNeill's emergent medical condition manifested itself through extreme pain and persistent tachycardia of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in placing MacNeill's health in serious jeopardy; serious impairment to bodily functions; or serious dysfunction of any bodily organ or part.[33]

5.9     Finally, Harris's own records show that Harris ED's screening physician and nurses had actual knowledge of MacNeill's tachycardia.[35] And, even though the hospital considered tachycardia to be an emergent medical condition as evidenced by the Harris ED's care and treatment of other patients displaying similar levels of tachycardic symptoms, Harris ED discharged MacNeill at 4:55 a.m. without stabilizing or treating her emergent "acute" or

---

[27] *See* data from 1020 Harris ED cases; *and* Talbott Depo. Page 86 Line 2-8 (recognizing the hospital's standard protocols with respect to CT imaging with oral contrast and admitting that he himself had applied it to patients when concerned about the possibility of a leak).
[28] MacNeill bates #000035
[29] MacNeill bates #000035
[30] MacNeill bates #000035
[31] MacNeill bates #000035
[32] MacNeill bates #000035
[33] 42 U.S.C.S. § 1395dd(e)(1)(A); *see also* Harris Method Fort Worth Publication HMFW subject "Emergency Medical Screening and Patient Transfers" (Harris Policy) § 8.5 (defining emergency medical condition as one that manifests "itself by acute symptoms of sufficient severity (including severe pain)" such that the absence of immediate medical attention could reasonably be expected to cause . . . serious impairment...);
[35] MacNeill bates #000035

"severe" tachycardia or performing its routine secondary CT image study <u>with oral</u> contrast in order to "exclude" the possibility of the emergent stomach perforation identified in the screening physician's differential diagnoses.[36]

5.11    Less than nine hours afer Harris discharged her, MacNeill presented to Baylor All Saints Medical Center's Fort Worth Emergency Department (Baylor) in septic shock with abdominal pain and a heart rate of 142 bpm.

5.12    Baylor's medical examination included a CT image <u>with oral contrast</u>. The image study showed gross pneumoperitoneum and massive ascites diagnostic of a perforation. Baylor admitted MacNeill to the ICU and initiated efforts to stabilize her emergent condition by pushing fluid volumes, providing pressor support, intubation for ventilation and placement of a NG tube. Once stabilized, MacNeill was transferred to Dr. Jayaseelan for surgical repair of a 1 cm stomach perforation and treatment of peritonitis. The delay in diagnosing and treating the perforation caused her condition to materially deteriorate resulting in septic shock, peritoneal abscesses, bibasilar atelectasis, pleural fluid accumulation, low lung volumes and extensive bilateral infiltration.

## EMTALA VIOLATIONS AND CAUSES OF ACTION

6.0    EMTALA requires a hospital to provide all patients with "***an appropriate medical screening examination*** within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, ***to determine whether or not an emergency medical condition exits***."[43]

6.1    EMTALA does not define the phrase "appropriate medical screening

---

[36] MacNeill HMFW bates #000027
[43] 42 U.S.C.A. §1395dd(a) (emphasis added).

examination" other than to state that its purpose is to identify an "emergency medical

condition." In relevant part, section 1395dd(e)(1)(A) defines an "emergency medical condition"

as: a medical condition manifesting itself by acute symptoms of sufficient severity (including

severe pain) such that the absence of immediate medical attention could reasonably be expected

to result in (i) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily

organ or part.[45] Thus, the plain language of EMTALA mandates that an appropriate medical

screening examination is designed to identify *acute* and *severe* symptoms that alert the

physician of the need for immediate medical attention to prevent serious bodily injury. Harris's

relevant policy mirrors EMTALA's language with respect to "appropriate screening" and

"emergency medical condition."[46] Thus, because the language of Harris's policy mirrors that of

EMTALA, interpretation of EMTALA and relevant holdings by the Courts apply to Harris's

implementation of and compliance with EMTALA.

      6.2     Further, because Harris's Policy simply recites EMTALA's text, Harris has not

expressly defined any emergency screening protocols.  And, "absent such standard protocols," an

EMTALA claim may be established through "proof of a failure to meet the standard of care *to*

*which the Hospital adheres*."*Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 858, 1994 U.S. App.

LEXIS 34586, 20, 46 Soc. Sec. Rep. Service 237 (4th Cir. Va. 1994) (citing *Power v. Arlington*

*Hosp. Ass'n,* 800 F. Supp. 1384 n.6 (E.D. VA 1992) (emphasis added)(denying summary

judgment where the plaintiff showed facts suggesting that the screening examination she

received was not as "thorough and careful" as that received by other patients).  Moreover, when,

as here, the hospital does not have a standard screening procedure, the plaintiff can establish (1)

what an appropriate medical screening examination, within the capability of the hospital's

---

[45] 42 U.S.C.A. §1395dd(e)(1)(i-iii)
[46] Harris Policy §§ 4.1.1., 8.5.

emergency department, would have been to determine whether an emergency condition existed, and (2) that the hospital departed from that appropriate examination. *See Griffith v. Mt. Carmel Medical Ctr.*, 831 F. Supp. 1532, 1539-1540 (D. Kan. 1993) (denying summary judgment when Plaintiff showed evidence of disparate screening treatment).  And, the First Circuit has held that an "'appropriate' screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures." *Sastre v. Hosp. Doctor's Ctr., Inc.*, 93 F. Supp. 2d 105, 109-110, 2000 U.S. Dist. LEXIS 4903, 12 (D.P.R. 2000) (citing *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C. Cir. 1991)). In successfully pursuing an EMTALA claim, the plaintiff must show that, in screening him or her, the hospital failed to follow the screening policy or standard of care which it regularly follows for other patients presenting substantially similar conditions. *Sastre v. Hosp. Doctor's Ctr.*, Inc., 93 F. Supp. 2d 105, 109-110, 2000 U.S. Dist. LEXIS 4903, 12 (D.P.R. 2000) (citingPower v. Arlington Hospital Association, 42 F.3d 851, 858 (4th Cir. 1994)).

6.3     And Courts, including the Fifth Circuit and the Judges of the Northern District of Texas, have recognized that assessing the "appropriateness" of a medical screening examination in the context of EMTALA also includes determining whether or not the medical screening examination was performed equitably in comparison to other patients with similar symptoms.[47]  Accordingly, EMTALA imposes a statutory duty on a hospital to provide patients in  its emergency room w i t h  a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients *and* provide that level of screening uniformly to *all* those who present substantially similar complaints.[48]

---

[47] *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 321(5th Cir. 1998)*; Martinez v. Porta,* 598 F.Supp.2d 807, 812 (N.D. Tex. 2009)*; Southard v. United Reg'l Health Care Sys.,* 245 F.R.D. 257, 259 (N.D. Tex. 2007).
[48] *Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1192 (1st Cir. 1995); *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872,

6.4     Conversely, a hospital violates EMTALA's appropriate medical screening examination requirement if a hospital's screening examination is not "reasonably calculated to identify the patient's critical medical condition" or if "the hospital treats the patient differently from other patients with similar symptoms."[49] The key requirement of the hospital's duty under section 1395dd(a) "is that a hospital apply its standard of screening *uniformly* to all emergency room patients."[50]

6.5     Although EMTALA was not intended to establish a nationalized standard of medical care, it does require each hospital to develop and to uniformly provide its own screening procedures to identify critical conditions in symptomatic patients. EMTALA recognizes that the phrase "appropriate medical screening examination" is defined "within the capability of **the** hospital's emergency department, including ancillary services routinely available to the emergency department.[51]

6.6     EMTALA also requires that if the hospital determines that the individual has an emergency medical condition, then the hospital must provide . . . for such further medical examination and such treatment as may be required to stabilize the medical condition, or for transfer of the individual to another facility.[52]

**Texas Health Harris Methodist Hospital Fort Worth failed to provide MacNeill with the same medical screening examination provided to other patients with similar complaints and symptoms.**

---

879 (4th Cir. 1992)*; Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991); Cruz-Queipo v. Hosp. Espanol Auxilio Mutuo de Puerto Rico, 417 F.3d 67, 70 (1st Cir. 2005); see also Battle v. Memorial Hosp.* 228 F.3d 544, 557 (5th Cir. 2000); *del Carmen Guadalupe v. Agosto,* 299 F.3d 15, 21(1st Cir. 2002).
[49] *Battle,* 228 F.3d at 557.
[50] *Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 856 (4th Cir. 1994).
[51] 42 U.S.C.A. § 1395dd(a)(emphasis added); *Martinez v. Porta,* 598 F.Supp. 2d. 807, 813 (N.D. Tex. 2009) (citing *Baber,* 977 F.2d at 879) (recognizing that EMTALA's appropriate medical screening requirement "is an individualized standard and is based upon the capabilities of each hospital's emergency department").
[52] 42 U.S.C.A. §1395dd(b)(1).

7.0     MacNeill presented to Harris ED, within 24 hours of gastric surgery, complaining of abdominal pain. Although, MacNeill presented as tachycardic, post-operative, and Harris ED's screening physician's differential diagnosis included a surgical complication of perforation or leak, Harris failed to provide MacNeill with the same medical screening examination provided to other patients with similar complaints, symptoms, and differential diagnoses.

7.1     A review of 1,020 medical charts of other Harris ED patients shows that MacNeill was screened disparately from other Harris ED patients with similar complaints, symptoms, and differential diagnoses.  Harris ED data show that unlike MacNeill, 100% of the patients presenting with the same chief complaint of abdominal pain whose  differential diagnosis included a perforation or leak received a medical screening examination that included a CT image with oral contrast.  MacNeill presented to Harris ED with a chief complaint of abdominal pain and Dr. Talbott's differential diagnosis included a post operative complication of perforation or leak.[55]  Despite this, and in contravention of Harris ED's own screening protocols established by and followed in 100% of the cases identified with similar symptoms and differential diagnoses, MacNeill did not receive a CT imaging study with oral contrast—*a screening diagnostic performed on 100% of comparable patients*.

7.2     On April 29, 2012, MacNeill received disparate treatment. Harris ED's own data show that MacNeill did not receive the same standard medical screening examination performed on 100% of other  Harris ED patients with abdominal pain and whose differential diagnoses included perforation or leak.

7.3     Similarly, the data also show that 100% of the Harris ED patients presenting with a chief complaint of abdominal pain whose differential diagnosis included post-operative

[55] Talbott Depo. Page 43 Line 9-11.

complication received a CT image <u>with oral contrast</u>.  MacNeill presented with a chief complaint of abdominal pain and Harris ED noted that she had undergone "gastric sleeve placement yesterday."[57] Dr. Talbott's differential diagnosis of MacNeill's condition included "post surgical complications"[58] and yet, MacNeill did not receive a CT imaging study with oral contrast, the hospital's standard screening examination for her symptoms and differential diagnoses.

7.4    The data show that  on April 29, 2012, Harris ED did not provide MacNeill with the same standard medical screening examination that it used on 100% of its other Harris ED patients with abdominal pain and differential diagnoses of post-operative complications.

7.5    Hospital records show that examining physicians will <u>routinely</u> send a patient back to repeat a CT imaging study with oral contrast "whenever a radiologist is concerned about the possibility of a leak." The radiologist here expressed concern about the possibility of a leak, yet Dr. Talbott did not send Beth MacNeill back to repeat the CT image <u>with oral contrast</u> —*a screening diagnostic performed on 100% of comparable patients*.

7.6    This is yet another indication that MacNeill received disparate treatment On April 29, 2012. She did not receive the medical screening examination "routinely" provided to similar patients with the possibility of a leak. This is also an indication that Dr. Talbott did not meet his duty to "determine, with reasonable clinical confidence," whether or not Beth MacNeill was suffering from an emergency medical condition.

**Texas Health Harris Methodist Hospital Fort Worth Emergency Department knew that MacNeill had an emergent medical condition but failed to stabilize her condition prior to discharge.**

8.0    MacNeill presented to Harris ED within 24 hours of gastric surgery, complaining

---

[57] MacNeill bates #000007
[58] Talbott Depo. Page 51 Line 10-13.

of abdominal pain.[62] She rated the severity of her pain a 10/10 prior to receiving 100 mcg's of fentanyl.[63] She had an elevated white blood cell count indicative of infection and the CT imaging study showed a moderate amount of ascites and extraluminal gas even without oral contrast. Her triage heart rate was 120 bpm.[64]   At 1:00a.m. her heart rate was 138 bpm.[65] At 1:30 a.m. her heart rate was 152 bpm.[66] At 2:09 a.m. her heart rate was 153 bpm.[67] At 2:55 a.m.[68] her heart rate was 143 bpm and at the time of her discharge, at 4:55 a.m., her heart rate was 146 bpm.[69]

8.1     The Harris ED staff had actual knowledge of the emergent nature of MacNeill's tachycardia. And, Harris ED's own data show that the hospital considers tachycardia at the levels MacNeill experienced, to be an emergency condition. Of the 1,020 medical charts of other Harris ED patients analyzed, seventy-one (71) presented with a with a chief complaint of abdominal pain and a  heart rate > 120 bpm. Of those 71 patients, ony one patient was discharged with a heart rate > 120 bpm—and that patient was discharged "against medical advice" with a heart rate of 140 bpm. Harris ED discharged MacNeill with a heart rate of 146 bpm.

8.2     Further, The medical chart of the patient that was discharged "against medical advice" contained the following notations:

- Chief Complaint: Abdominal pain
- Review of Systems: Nausea, Abdominal pain, Negative vomiting
- Physical Exam: Tachycardia, general tenderness of the abdomen
- Differential Diagnosis: Appendicitis, gastritis, bowel obstruction, UTI, leukocytosis
- Encounter Diagnosis: Abdominal pain, tachycardia
- Nurses Note:
  *1:16 The pt decided to sign out against the medical advice of nurses and treating physician.*
  *1:16 Pt's HR 140 prior to discharge*
  *1:17 I explained to the pt the importance of evaluation of tachycardia, but he refuses*

---

[62] MacNeill bates #000035
[63] Fentanyl is a Schedule II synthetic opioid analgesic with rapid onset. It is considered approximately 80 to 100 times more potent than morphine and 15 to 20 times more potent than heroin.
[64] Tachycardia is defined as a heart rate > than 100 bpm.
[65] MacNeill bates #000035
[66] MacNeill bates #000035
[67] MacNeill bates #000035
[68] MacNeill bates #000035
[69] MacNeill bates #000035

These entries clearly establish that Harris considers tachycardia of a level below that of MacNeill's to be an emergent condition.  Thus, the data show that at the time of her discharge, Harris had actual knowledge of the *acute* and *severe* nature of MacNeill's heart rate of 146 bpm, a condition acknowledged by own protocols to be an emergent condition.

8.3    Accordingly, the data show that MacNeill was treated disparately from effectively 100% of all other Harris ED patients presenting with a chief complaint of abdominal pain and a hear rate > 120 bpm.  The data established that of the Harris ED patients presenting to the Harris ED with substantially the same symptoms, MacNeill was the only patient discharged with a heart rate > 120 bpm. At the time of her discharge, MacNeill's resting heart rate had been > 138 bpm for 4 hours. Her heart rate at the time of her discharge was 146 bpm which was higher than the patient that Dr. Talbott discharged Against Medical Advice.

## DAMAGES

9.0    As a direct and proximate result of the Defendant's violations of EMTALA, acts and/or omissions, Beth Chaney MacNeill, has suffered past, present and future injuries and damages including, but not necessarily limited to, reasonable and necessary medical expenses, conscious physical pain and suffering, physical disability, physical disfigurement, mental anguish, emotional harm, lost earnings and loss of earning capacity. The amount of the above-described damages are substantially in excess of the minimum jurisdictional limits of this Court.

## DEMAND FOR JURY

10.0    Plaintiff has complied with the requirements of FRCP 38 (b) and 5 (d).

## DEMAND FOR JUDGMENT

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Beth Chaney MacNeill prays that the *Defendant* be cited to appear and answer herein, and that Plaintiff has judgment, jointly

and severally, against such *Defendant* as follows:

(1)     That Plaintiff, Beth Chaney MacNeill recover of and from the *Defendant* judgment for the above-described past and/or future injuries and damages in an amount in excess of the minimum jurisdictional limits of this Court;

(2)     That Plaintiff Beth Chaney MacNeill, recover pre-judgment interest on the amount accrued beginning on the 180th day after the date the *Defendant* receive written notice of claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered;

(3)     That Plaintiff, Beth Chaney MacNeill, recover post-judgment interest on the amount due at the highest legal rate allowed by law from the date of judgment until paid; and

(4)     That Plaintiff, Beth Chaney MacNeill, recover all costs of Court, and such other and further relief, at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully Submitted,

By  /s/ Robert Hammer_____
**Robert W. Hammer**
State Bar No.: 08854780

**Michael J. Henry**
State Bar. No.: 09482300

**ROBERT W. HAMMER**
675 North Henderson, Suite 300
Fort Worth, Texas  76107
Telephone  817/ 332-8266
Telefax      817/ 332-8708
robert@rhammerlaw.com

AND

**MICHAEL J. HENRY P.C.**
675 North Henderson, Suite 300
Fort Worth, Texas  76107

Telephone  817/ 877-3303
Telefax      817/ 338-9109
henry@henrytexlaw.com

**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that on April 3rd, 2015 I electronically filed the foregoing with the Clerk

for the U.S. District Court, Northern District of Texas, using the ECF system which will send

notification of such filing to the following counsel of record:

Gregory P. Blaies
James W. Hryekewicz
BLAIES & HIGHTOWER
421 W. Third Street, Suite 900
Fort Worth, Texas 76102
gregblaies@bhilaw.com
jwh@bhilaw.com

/s/ Robert Hammer_____
**Robert W. Hammer**